# UNITED STATES DISTRICT COURT
# DISTRICT OF MAINE

| UNITED STATES OF AMERICA | ) | |
|---|---|---|
| | ) | 2:19-cr-00032-JAW-001 |
| v. | ) | |
| | ) | |
| BRYAN BOLEY | ) | |

## PRESENTENCE ORDER ON APPLICATION OF SENTENCING ENHANCEMENT FOR RELOCATION OF A FRAUDULENT SCHEME PURSUANT TO UNITED STATES SENTENCING GUIDELINE § 2B1.1(b)(10)(A)

The United States of America seeks application of a two-level sentencing enhancement for relocation of a fraudulent scheme under United States Sentencing Guideline (U.S.S.G. or Guidelines) § 2B1.1(b)(10)(A) to a defendant being sentenced on various counts related to access device fraud. Based on the description of the offense conduct in the Presentence Investigation Report, the Prosecution Version of the Offense, and the Government's memorandum, the Court concludes that the Government failed to demonstrate that the defendant relocated his scheme, which was only ever located in Maine, or that the defendant's alleged relocation was for the purpose of evading law enforcement. The Court declines to apply the relocation sentencing enhancement.

## I. BACKGROUND

### A. Procedural Background

On January 24, 2019, the United States of America (Government) filed a criminal complaint against Bryan Boley. *Criminal Compl.* (ECF No. 1). Also on January 24, 2019, the Magistrate Judge issued an arrest warrant for Mr. Boley.

*Arrest Warrant* (ECF No. 4). On January 29, 2019, the Magistrate Judge held an initial appearance for Mr. Boley. *Min. Entry for Proceedings Held Before Magistrate Judge John H. Rich III* (ECF No. 8).

The Grand Jury issued a six-count indictment against Mr. Boley on March 1, 2019. *Indictment* (ECF No. 20).[1] The indictment alleged: (1) Count One, a conspiracy to use a counterfeit access device from July 31, 2018 until January 23, 2019; (2) Count Two, use or attempted use of a counterfeit access device between July 31, 2018 and August 12, 2018; (3) Count Three, use or attempted use of a counterfeit access device between September 2, 2018 and September 7, 2018; (4) Count Four, use or attempted use of a counterfeit access device between December 16, 2018 until December 26, 2018; (5) Count Five, possession of at least fifteen counterfeit access devices between an unknown date and January 23, 2019; and (6) Count Six, access device fraud – production or possession of device making equipment between an unknown date and January 22, 2019. *Id.* at 1-4. The indictment also contained a forfeiture allegation. *Id.* at 4-5. On May 16, 2019, Mr. Boley pleaded guilty to all counts of the indictment and consented to the forfeiture. *Min. Entry for Proceedings Held Before Judge John A. Woodcock, Jr.* (ECF No. 60). There is no plea agreement.

On September 6, 2019, the Government filed a memorandum seeking application of a sentencing enhancement for relocation of a fraudulent scheme to Mr. Boley. *Gov't Mem. in Support of Sentencing Enhancement for Relocation of a*

---

[1] On May 14, 2019, the Government filed an unopposed motion to amend the indictment of Mr. Boley to correct a clerical error. *Mot. to Amend the Indictment to Correct a Clerical Error* (ECF No. 57). On May 16, 2019, the Court granted this motion to amend without objection. *Order Granting Mot. to Amend Count IV of Indictment* (ECF No. 59).

*Fraudulent Scheme* (ECF No. 117) (*Gov't's Mem.*). On September 20, 2019, Mr. Boley filed a response. *Resp. to Gov't Mem. in Support of Sentencing Enhancement for Relocation of Scheme* (ECF No. 119) (*Def.'s Resp.*). On September 27, 2019, the Government filed a reply. *Gov't's Sentencing Mem. and Reply to Def.'s Resp. to Gov't's Mem. in Support of Sentencing Enhancement for Relocation of a Fraudulent Scheme* at 8-11 (ECF No. 127) (*Gov't's Reply*). On October 21, 2019, the Government filed a supplemental sentencing memorandum that included a discussion of the relocation enhancement. *Gov't's Suppl. Sentencing Mem.* at 4-5 (ECF No. 136) (*Gov't's Suppl. Mem.*). On October 28, 2019, Mr. Boley filed a supplemental sentencing memorandum that included a discussion of the relocation enhancement. *Def.'s Suppl. Sentencing Mem.* (ECF No. 141) (*Def.'s Suppl. Mem.*).

**B.     Facts**[2]

From July 31, 2018 to January 23, 2019, Mr. Boley resided in Maryland or the Washington, D.C. area. *Am. Pros. Ver.* at 1; *PSR* ¶ 51. Mr. Boley has an uncle who lives in Maine, with whom he stayed one night. *PSR* ¶ 8-9. Mr. Boley, along with two other members of the conspiracy, "traveled to Maine to commit access device fraud." *Am. Pros. Ver.* at 1. When Mr. Boley's hotel room in Maine was searched pursuant to a warrant on January 22, 2019, his room contained:

> approximately 85 plastic cards, including 20 unopened gift cards; a credit card reading and writing machine; a white Alcatel cell phone; a dell laptop; Greyhound bus tickets from Washington, D.C., to Boston, MA, and a receipt and itinerary from Boston, MA, to Burlington, VT;

---

[2]     The relevant facts are laid out in the amended prosecution version, *Am. Prosecution Version* (ECF No. 56) (*Am. Pros. Ver.*), and pre-sentence investigation report (PSR), *Revised Presentence Investigation Report* (*PSR*), as well as the Government's supplemental memorandum. The Court recites the facts deemed relevant by the parties in their briefing papers.

3

> and a collection of approximately 25 receipts showing multiple purchases or attempted purchases of gift cards and other items in Maine, as well as a receipt from Vermont, two receipts from Massachusetts, and a receipt from Washington, D.C.

*Id.* at 3-4. The PSR reflects that Mr. Boley and his co-conspirators committed fraud in various locations in southern Maine, including stores located in Auburn, Lisbon Falls, Lewiston, South Portland, and Topsham. *PSR* ¶¶ 8-11; *Gov't's Mem.*, Attach. 1. Additionally, a review of the laptop found in Mr. Boley's hotel room has revealed "51 additional cards, 38 . . . from various locations in Maine, 6 . . . from Massachusetts, 3 . . . from Virginia, 2 . . . from Maryland, and 1 each from Vermont and Wisconsin." *Gov't's Suppl. Mem.* at 4.

## II. POSITIONS OF THE PARTIES

### A. Government's Motion

The Government supports application of the relocation enhancement, arguing this case is more like cases where courts have applied the enhancement than those where they have not. *Gov't's Mem.* at 4. Mr. Boley "and his co-conspirators resided in Maryland, in the greater D.C. area, but came several states north to Maine to commit access device fraud." *Id.* at 5. Additionally, "[w]hen [Mr. Boley's] hotel room was searched, there were bus tickets found there reflecting travel from Washington, D.C., to Boston, MA, and travel from Burlington, VT, to Boston, MA . . . ." *Id.* Twenty-five receipts were also found, with one from Vermont "reflect[in]g the purchase of clothing at the University Mall in Burlington," one from Brookline, Massachusetts for an item valued at approximately $5 at a CVS, and one from Washington, D.C. "reflect[ing] the purchase of a money order." *Id.* at 5 n.2. More relevantly, one receipt

4

found from an Old Navy in Everett, Massachusetts, "reflect[ed] the purchase of two gift cards, each valued at $50.00—in line with [Mr. Boley's] other purchases of gift cards in Maine." *Id.* The Government also points out that "[r]eceipts and police reports reflect that [Mr. Boley] and his co-conspirators committed fraud in a variety of locations in southern Maine, including at least various stores located in Auburn, Lisbon Falls, Lewiston, South Portland, and Topsham . . .." *Id.* at 5.

The Government contends this pattern of behavior is most like that in *United States v. Thung Van Huynh*, 884 F.3d 160 (3d Cir. 2018), a case involving purchases of jewelry in sixteen states that would then be shipped back to California for sale, although it acknowledges that "the only available evidence of the conspiracy's activity relates to various locations in Maine." *Gov't's Mem.* at 5; *Thung Van Huynh*, 884 F.3d at 163. The Government says that the recovered receipts and bus tickets suggest that the scheme "extended into at least Massachusetts . . . and possibly Vermont," constituting "a 'relocation' of the scheme from [Mr. Boley's] state of residence, even if he never performed any fraudulent activity in [his home state of] Maryland." *Id.* The Government differentiates this case from *United States v. Hines-Flagg*, 789 F.3d 751 (7th Cir. 2015), because there, the defendant operated in four contiguous states, and here, Mr. Boley's area of operation is geographically removed from Maryland. *Gov't's Mem.* at 6.

The Government also points out that "[Mr. Boley] has no apparent connection to Maine apart from his uncle, with whom he only stayed one night," *id.*, and argues that this case is similar to *United States v. Thornton*, 718 Fed. App'x 399 (6th Cir.

5

2018), a case involving a bank fraud conspiracy reaching across thirteen states and including "approximately 1,400 counterfeit checks and almost $3 million in intended loss," *id.* at 400, in that "the evidence supports that the defendants in this case operated the scheme as they traveled." *Gov't's Mem.* at 7. The Government contends that "Maryland or the D.C. area [did not] serve[] as a singular 'hub'" because "all essential aspects of the scheme . . . were conducted in Maine . . . ." *Id.* at 7.

### B. Bryan Boley's Opposition

Mr. Boley argues that this case is much more like *Hines-Flagg*, as "[t]he facts support a finding that Mr. Boley engaged in fraudulent activity in Maine and Maine alone" because the Government has not presented evidence "that Mr. Boley was actually engaged in fraudulent activity in Maryland, Massachusetts, or Vermont . . . ." *Def.'s Resp.* at 1. Mr. Boley points out that the Guidelines refer to relocation of the scheme, not the defendant, *id.* at 2 (quoting *Hines-Flagg*, 789 F.3d at 755), and that Mr. Boley "has . . . had a fairly transient existence," such that "it would not be unusual for Mr. Boley to visit any number of states," including Maine, where he has an uncle. *Id.* Mr. Boley argues that "[i]n order for a fraudulent scheme to be relocated, it logically need have occurred in more than one location," and here, the Government has presented no evidence beyond its speculative inference based on a small number of receipts that that is true. *Id.* at 2-3.

Mr. Boley differentiates *Thung Van Huynh* and *United States v. Savarese*, 686 F.3d 1 (1st Cir. 2012),[3] pointing out that in those cases, the Government provided

---

[3] In *Savarese*, Mr. Savarese "visited nearly 150 different Bally Total Fitness and 24-Hour Fitness clubs across the United States" to steal credit cards from gym lockers. *Savarese*, 686 F.3d at

6

evidence that "the defendants did engage in fraudulent activity in multiple locations, moving their schemes from one place to the next." *Def.'s Resp.* at 3. In *Thung Van Huynh*, the fraudulent purchases were made at jewelry stores throughout the country, and in *Savarese*, visits were made to 150 fitness clubs across the country. *Id.* If such a pattern existed, Mr. Boley argues, an inference of relocation would be easy, but the Government has not established one. *Id.*

Additionally, Mr. Boley argues that, should the Court find that Mr. Boley did relocate his scheme, the Government has not met its burden to show that the purpose of his relocation was to evade law enforcement, as "the Government relies on thin evidence and weak logic in a case where no evidence suggests that Mr. Boley was relocating for this purpose." *Id.* at 4. Here, Mr. Boley asserts, "there is no evidence of fraudulent activity in other locations, simply a bus ticket, a few receipts, and a suggestion by the Government that Mr. Boley's travel was necessarily part of his fraudulent scheme." *Id.* Mr. Boley adopts the reasoning of the *Hines-Flagg* Court to argue that "application of [the relocation] enhancement requires more than just the operation of a multijurisdictional scheme in order to reduce the chances of detection." *Id.* at 4-5 (quoting *Hines-Flagg*, 789 F.3d at 756). Mr. Boley points out that in *Thung Van Huynh* and other cases where courts have inferred a purpose of evading law enforcement, there were additional relevant factors. *Id.* at 5. In *Thung Van Huynh*, for instance, the defendant did not return to two particular states after he was

---

5. He would then fax his associates the names on the cards, and one of these associates would commission Boston-based photographers to manufacture fake IDs with pictures of the members of the conspiracy. *Id.*

7

questioned there. *Id.* (citing *Thung Van Huynh*, 884 F.3d at 163). Here, "Mr. Boley attempted multiple purchases at the same Rite-Aid in the Lewiston area . . . and . . . at the same Wal-Mart location in the area." *Id.* at 6. Additionally, "[t]here is no indication that Mr. Boley traveled under an assumed name [or made] an effort to conceal his identity," and he "used his own credit card, in his own name, to pay for at least one night in a motel in Lewiston." *Id.*

### C. Government's Reply

The Government argues that Mr. Boley's position "is predicated on a narrower view of the term 'relocation' than the breadth supported by relevant case law." *Gov't's Reply* at 8. The Government compares Mr. Boley's activity to *Thung Van Huynh*, pointing out that Maine is geographically far from Maryland and that unlike in *Thung Van Huynh*, Mr. Boley did not need to return to Maryland to "fence" the benefits of his fraud because his goods were "data-based," as opposed to the physical goods in *Thung Van Huynh*. *Id.* The Government argues that the "salient point" of the *Thung Van Huynh* and *Savarese* Courts' analyses is that "the defendant focused fraudulent efforts in another jurisdiction apart from his residence, which would reduce the chances to get caught." *Id.*

The Government responds to Mr. Boley's argument that "the enhancement applies only to relocation of the scheme and not of the defendant" by stating that "[Mr. Boley's] physical movement is in itself immaterial; what matters is that by his actions, he moved his scheme to Maine." *Id.* at 9. The Government also states that, while it is true that the enhancement does not apply to any scheme that operates in

8

multiple jurisdictions, it is not attempting to apply the enhancement merely because the "scheme is multi-jurisdictional," but because "Maine is not contiguous with, or particularly close to, [Mr. Boley's] state of residence." *Id.* at 9-10.

The Government points out that Mr. Boley's supposed argument "that he was in Maine to visit family, and simply happened to commit fraud while he was here" is implausible because his uncle "did not know why [Mr. Boley] was in Maine, but assumed he was selling cocaine base," and because Mr. Boley "travel[led] to Maine repeatedly with at least two co-conspirators from Maryland, with whom he had no apparent relation." *Id.* at 10. The Government further responds to Mr. Boley's argument that his scheme was "less sophisticated than those in cases on which the government relies" by pointing out that "the guideline does not require that the relocation be accomplished with sophistication . . .." *Id.* Additionally, the Government argues "[Mr. Boley's] history also suggests he may have been motivated to relocate a scheme apart from where he lived" because in 2007, he was charged with credit card fraud "unrelated to the conspiracy in the present case," an experience the Government says "would provide an incentive to conduct criminal activities in distant locales to minimize the chance of being caught." *Id.* at 11. Lastly, the Government states that, contrary to Mr. Boley's argument that "there is no evidence that he traveled under an assumed name or that he made any effort to conceal his identity," the bus tickets found in Mr. Boley's hotel room had the names of aliases, as did an email address associated with one of the cell phones found there. *Id.*

### D. Government's Supplemental Sentencing Memorandum

The Government discusses additional evidence gleaned from an examination of Mr. Boley's laptop which it says further supports application of the relocation enhancement. The Government says it has discovered fifty-one additional card numbers purchased by Mr. Boley, and that "38 were from various locations in Maine, 6 were from Massachusetts, 3 were from Virginia, 2 were from Maryland, and 1 each [were] from Vermont and Wisconsin . . .." *Gov't's Suppl. Mem.* at 4. Though the Government does not point to any additional fraudulent activity that it says took place outside of Maine, the Government argues that "[t]he fact that [Mr. Boley] purchased cards associated with states other than Maine, including Massachusetts and Vermont, read together with receipts recovered from Massachusetts and Vermont, provides further support that he conducted aspects of the fraudulent scheme in other states in addition to Maine." *Id.* (citations omitted). Therefore, in the Government's view, "[w]hether most of the fraudulent activity occurred in Maine, or whether it is simply that most of the known activity occurred in Maine, is ultimately immaterial, as there is evidence that the defendant relocated the scheme to various towns within Maine, as well as to locations outside Maine." *Id.* at 4-5.

Additionally, the Government argues that though "the fact that cards were acquired from Maryland and Virginia suggests some of the fraudulent activity may have occurred nearer to where [Mr. Boley] lived as well, there is no indication that the D.C. area served as a hub for planning activities elsewhere." *Id.* at 5. In the Government's view, this brings the factual scenario here in line with *Thornton*, in

that "[t]he evidence supports that [there] was a scheme that [Mr. Boley] and his co-conspirators carried with them to each location in which they conducted it." *Id.*

### E. Bryan Boley's Supplemental Sentencing Memorandum

Mr. Boley argues that "the Government's additional evidence showing account numbers associated with a number of states" does not alter his analysis of the applicability of the relocation enhancement, and he "rests on his previously-submitted memorandum . . .." *Def.'s Suppl. Mem.* at 1.

## III. LEGAL STANDARD

The Government "bears the burden of proving the applicability of a sentencing enhancement" by a preponderance of the evidence. *United States v. Flete-Garcia*, 925 F.3d 17, 26 (1st Cir. 2019) (citing *United States v. McCormick*, 773 F.3d 357, 359 (1st Cir. 2014)). U.S.S.G. § 2B1.1(b)(10)(A) states: "If . . . the defendant relocated, or participated in relocating, a fraudulent scheme to another jurisdiction to evade law enforcement or regulatory officials . . . increase by 2 levels. If the resulting offense level is less than level 10, increase to level 10." The Guidelines do not define the term "relocate," so courts have given the word its ordinary meaning of "to 'establish or lay out in a new place.'" *United States v. Morris*, 153 Fed. App'x 556, 557-58 (11th Cir. 2005) (quoting *Relocate*, WEBSTER'S THIRD NEW INTERNATIONAL UNABRIDGED DICTIONARY (1976)); *see also Thornton*, 718 Fed. App'x at 404; *Hines-Flagg*, 789 F.3d at 755. The enhancement "clearly refers to relocation of the scheme only, not the relocation of the defendants," *Hines-Flagg*, 789 F.3d at 755 (quoting *United States v. Paredes*, 461 F.3d 1190, 1193 (10th Cir. 2006)) (emphasis omitted), and it "does not

11

state that it applies to fraudulent schemes that operate in or cross multiple jurisdictions . . .." *Id.*

Where the relocation is made merely as a method of operation, as opposed to for the purpose of evading law enforcement, the enhancement is not applicable. *Savarese*, 686 F.3d at 16 n.12. The relocation of the defendant "need not 'be motivated by a "specific" threat of arrest as opposed to a more general intent to evade law enforcement.'" *Thornton*, 718 Fed. App'x at 404 (quoting *United States v. Vega-Iturrino*, 565 F.3d 430, 433 (8th Cir. 2009)). Whether a scheme was relocated is "a strictly factual test . . .." *Thung Van Huynh*, 884 F.3d at 165 (quoting *United States v. Richards*, 674 F.3d 215, 220 (3d Cir. 2009)).

## IV. ANALYSIS

In *Savarese*, the First Circuit observed that U.S.S.G. § 2B1.1(b)(10)(A) "prescribes a two-level increase if the defendant (1) relocated, or participated in relocating, a fraudulent scheme to another jurisdiction, and (2) did so with the intent to evade law enforcement or regulatory officials." 686 F.3d at 15. The Court addresses each factor in turn.

### A. Relocation

For something to be "relocated," it must first have been located somewhere else. The Government argues that Mr. Boley relocated his scheme from Maryland to Maine because Mr. Boley "resided in Maryland . . . but came several states north to Maine to commit access device fraud." *Gov't's Mem.* at 5. This, in the Government's view, "constitutes a 'relocation' of the scheme from [Mr. Boley's] state of residence,

even if he never performed any fraudulent activity in Maryland." *Id.* at 5-6 (citing *Thung Van Huynh*, 884 F.3d at 168). The Court is not clear on how a scheme which the Government concedes never existed in Maryland can have been relocated from Maryland to Maine. The Government acknowledges that "all essential aspects of the scheme . . . were conducted in Maine," *id.* at 7, and beyond saying that Mr. Boley relocated the scheme from Maryland to Maine, the Government does not explain what, if anything, Mr. Boley did in Maryland that he relocated to Maine. At most, the Court could infer that Mr. Boley hatched the scheme with others in Maryland to carry out the scheme in Maine, but the Court found no authority that, without more, extends § 2B1.1(b)(10)(A) to schemes cooked up in one jurisdiction and carried out in another. Without some allegation of activity in Maryland related to the scheme, the Court cannot find that Mr. Boley's scheme was relocated from Maryland.

Regarding Mr. Boley's trips outside of Maine, the Court views the situation here as distinct from *Thung Van Huynh*, a case in which merchandise stolen from sixteen different states was returned to a central hub to be sold. 884 F.3d at 163. In *Thung Van Huynh*, movement among states was a deliberate component of the scheme, as evidenced by the fact that the defendants did not return to states in which they received attention from law enforcement. *Id.* at 169. In this case, much like in *Morris*,[4] Mr. Boley took occasional but temporary trips out of Maine, and always

---

[4] In *Morris*, Mr. Morris was involved in a conspiracy whereby he and others would break into gym lockers at clubs in Atlanta, Georgia, steal credit cards and driver's licenses, buy electronic equipment, and give it to a co-defendant. *Morris*, 153 Fed. App'x at 557. Mr. Morris' co-defendant would then sell the goods on eBay or ship them to other states for resale. *Id.* The Government showed evidence that Mr. Morris, on at least several occasions, traveled to a different district to engage in this conduct, *id.* at 558; however, because "the out-of-town trips were . . . temporary and . . . [Mr. Morris] always returned to the Northern District of Georgia," and "one stage of the conspiracy was to deliver

13

returned here. *Morris*, 153 Fed. App'x at 558. While this may constitute a relocation of Mr. Boley, it is not clear that it constitutes a relocation of Mr. Boley's scheme.

The Government has insinuated, but not actually alleged, that Mr. Boley engaged in fraudulent activity in jurisdictions other than Maine. *See Gov't's Mem.* at 5 and n.2; *Gov't's Suppl. Mem.* at 4-5.[5] However, even if the Government had made firmer allegations of fraud outside of Maine, it is not clear how this would take Mr. Boley's activity outside the territory of *Morris*. The significant bulk of Mr. Boley's activity—whether all or close to all—took place in Maine, and the Government has provided no evidence that the center of Mr. Boley's scheme ever shifted from Maine or that he intended such a shift.

Mr. Boley's circumstances are also far different from the factual situations in *Savarese* and *Thornton*. In *Savarese*, the defendant visited "nearly 150 different Bally Total Fitness and 24-Hour Fitness clubs across the United States." 686 F.3d at

---

the goods to [the co-defendant's] home, located in the Northern District of Georgia, to allow [him] to sell the merchandise," the Eleventh Circuit found that application of the enhancement was error. *Id.* at 558-59.

[5] In its October 21, 2019 supplemental memorandum, the Government says that its forensic examination of Mr. Boley's laptop computer revealed "stored logins for seven websites that sell compromised credit card data" and an "internet history data consistent with a user buying credit card data from October 21, 2018 through January 18, 2019." *Gov't's Supp. Mem.* at 3. It goes on to say that "only one page, corresponding to one site from which 51 compromised accounts with credit card track data were purchased was recovered." *Id.* Later, the Government points out that:
> the recovered webpage reveals that when the defendant purchased the newly identified card numbers, the website from which he purchased them—briansclub—associated them with particular cities, states, and zip codes. Of 51 additional cards, 38 were from various locations in Maine, 6 were from Massachusetts, 3 were from Virginia, 3 were from Maryland, and 1 each from Vermont and Wisconsin.

*Id.* at 4. The Government discovered that Mr. Boley had receipts for one purchase in Everett, Massachusetts, one in Brookline, Massachusetts, one in Burlington, Vermont, and the purchase of a money order in Washington, D.C., all between December 28, 2018 and January 15, 2019.

This forensic information does not put Mr. Boley in a good light and suggests that he was engaged or planning to engage in other fraudulent activity. But there is too little information in this record to conclude that any of this activity relates to the fraudulent scheme charged and admitted in this case or, for that matter, to the relocation enhancement of § 2B1.1(b)(10)(A).

14

5. By contrast, Mr. Boley conducted his fraud largely in Maine, and the Government can only point to one instance (which it merely suspects to have been fraud) that took place out of the state, along with some receipts and access device numbers which it says suggest broader interjurisdictional activity. *Gov't's Mem.* at 5 and n.2; *Gov't's Suppl. Mem.* at 4-5. While in *Savarese*, most instances of fraud were in different geographic areas and repeated trips to the same area were aberrant, *Savarese*, 686 F.3d at 5, 16 n.12, here Mr. Boley perpetrated the fraud in Maine and, if he did so elsewhere, his fraudulent activity outside Maine was aberrant.

*Thornton* is similarly distinguishable. In that case, a group of co-conspirators visited thirteen states and "fleeced local banks for a day or two before moving on to another town." *Thornton*, 718 Fed. App'x at 400. The scheme involved "1,400 counterfeit checks and almost $3 million in intended loss." *Id.* There is no indication in *Thornton* that the defendants returned to any individual state; rather, "the relevant bank fraud was completed in each new location: the conspirators would steal checks, recruit check cashers, make the counterfeit checks . . . and cash the counterfeit checks before leaving town." *Id.* at 405. The move from one state to another was a component of the scheme and done in a purposeful and repetitive manner. *See id.* at 404-05. As Mr. Boley notes, that is not the case here. *Def.'s Resp.* at 3. The record in this case suggests neither a pattern of fraudulent activity across jurisdictions that would allow the Court to draw an inference that movement to new jurisdictions was a component of the scheme, nor that Mr. Boley ever intended to

15

relocate the scheme outside of Maine. Additionally, Mr. Boley's repeated returns to Maine suggest that the enhancement is not appropriate.

### B. Purpose to Evade Law Enforcement

Even if the Court were to find that Mr. Boley relocated his scheme, the Government has not met its burden to show that Mr. Boley acted with a purpose to evade law enforcement. In its moving brief, the Government refers to this prong only in its discussion of the legal standard. *Gov't Mem.* at 2 (stating that "[r]elocation need not be motivated by a specific threat of arrest as opposed to a more general intent to evade law enforcement" (quoting *Thornton*, 718 Fed. App'x at 403-04) (alternation in original)); *see also id.* at 3-4. In its reply, the Government advances two arguments for why the Court should infer a purpose to evade law enforcement. The first is that Mr. Boley had previously and unrelatedly been charged with—though not convicted of—credit card fraud in Maryland in 2007. *Gov't Reply* at 11. While this argument may support the idea that Mr. Boley's initial decision to locate his scheme in Maine as opposed to Maryland was for the purpose of evading law enforcement, it does not support an inference that the scheme was relocated for this purpose.

The second argument made by the Government in its reply is that, contrary to Mr. Boley's assertion, *Def.'s Resp.* at 6, there is evidence that he traveled under assumed names, as the bus tickets recovered from his hotel room bore names other than his own. *Gov't Reply* at 11. Specifically, the Government writes:

> [T]he bus tickets found in the defendant's hotel room bore the passenger names "Steve Williams," "Andre Williams," and "Andre Lee," with a

> receipt to "Steve Jones" – none bore the defendant's name. Similarly, the email associated with one of the cell phones recovered, willyjames414@gmail, which was utilized to procure access device numbers, is suggestive of a name other than the defendant's, despite the artifacts associating the defendant with this email address.

*Id.* at 11.

In *Vega-Iturrino*, the Eighth Circuit addressed a situation where the defendant and her co-conspirators "flew from California to Kansas City, Missouri under assumed names with the purpose of stealing credit cards from shoppers, she made purchases using the identities and credit cards of her victims, and, upon her arrest, she was found to be in possession of counterfeit drivers licenses and other identification documents." 565 F.3d at 433. The *Vega-Iturrino* Court concluded that these facts "were sufficient to support the district court's finding that Vega-Iturrino relocated with the intent to avoid law enforcement." *Id.*

The facts in Mr. Boley's case are distinct from *Vega-Iturrino*. To the extent it addresses the issue, the Amended Prosecution Version states that Mr. Boley made purchases in Maine in his real name:

> After leaving Rite-Aid in the afternoon of September 7, 2018, Boley was approached by detective David Madore outside of the Auburn Public Library, where Detective Madore conducted a field interview. At this point, <u>Boley was in possession of a United States passport, which had his photo on it, as well as a Social Security card bearing his name</u>. Boley was also in possession of 12 gift cards and<u> three credit cards, the latter of which had Boley's name on them.</u>

*Am. Pros. Ver.* at 2 (emphasis added). There is no evidence in this record that Mr. Boley actually attempted to use an alias to carry out any part of the criminal scheme in Maine. The situation would be different if, like Ms. Vega-Iturrino, he had come to

17

Maine under an alias, committed crimes of fraud here only under that alias, and intended to return to Maryland and reassume his real name. Sneaking into and out of Maine under an assumed name while committing crimes in Maine under his real name is peculiar behavior, but it is not evidence of evading law enforcement when committing the crimes. The unexplained fact that he had bus tickets and an email in other names suggests that he was up to no good, but as the record does not reveal he actually used any aliases to hide his identity while committing the fraudulent activity in Maine, the link between his possession of false identities and his travel mostly between Maine and Maryland is speculative.[6]

Additionally, Mr. Boley's general pattern of activity indicates that law enforcement was not front-of-mind. As just noted, when Mr. Boley encountered law enforcement on September 7, 2019, he had a United States passport and other identification in his real name. Additionally, Mr. Boley returned to the same stores on multiple occasions. *See id.* ¶¶ 8, 10 (stating that Mr. Boley visited the same Walmart and Rite Aid in Auburn four times each). Returns to these stores, as well as Mr. Boley's focus on southern Maine, are not suggestive of his intent to avoid detection through the strategic choice of disparate geographic targets.

**C.  Summary**

Based on the record before it, the Court concludes that the Government failed to meet its burden of proof to demonstrate either that Mr. Boley "relocated, or participated in relocating, a fraudulent scheme to another jurisdiction," or that he

---

[6]     In addition to these Maryland-Maine trips, there was also a receipt for travel between Burlington, Vermont and Boston, Massachusetts.

18

"did so with the intent to evade law enforcement or regulatory officials." *Savarese*, 686 F.3d at 15.

V. **CONCLUSION**

The Court DENIES the United States of America's request for application of U.S.S.G. § 2B1.1(b)(10)(A) to Bryan Boley (ECF No. 117).[7]

SO ORDERED.

                                /s/ John A. Woodcock, Jr.
                                JOHN A. WOODCOCK, JR.
                                UNITED STATES DISTRICT JUDGE

Dated this 4th day of November, 2019

---

[7] The Court will resolve any remaining issues related to Mr. Boley's Guidelines calculation at his sentencing hearing.